Jack S. FOSTER, et al.

v.

The UNITED STATES.

No. 34–75.

United States Claims Court.

April 7, 1983.

Charles W. Willey, Santa Barbara, Cal., for plaintiffs. Richard J. Longpré, Corona Del Mar, Cal., of counsel.

Gerald S. Fish, Washington, D.C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION

HARKINS, Judge.

Previous proceedings, in the United States Court of Claims, determined that the Government is liable for a permanent taking of plaintiffs' property, represented by the right to extract and remove dolomite rock from two deposits on Tract 83 on Vandenberg Air Force Base, and that the taking occurred on November 18, 1971. The property taken is part of the mineral interest reserved by plaintiffs' predessors-in-interest when they sold Tract 83 for $22,750 to the Government on October 29, 1941, in connection with the activation of Camp Cooke, an Army installation to train armored and infantry divisions. On the tak-

ing date, plaintiffs were lessees, through a lease dated July 8, 1971, with the right to extract and remove all riprap rock. The lease did not include sand, gravel, diatomaceous material or petroleum products. The term was for 5 years, commencing June 1, 1971, with an option to renew for a period of 5 years on expiration of the original term; at an annual rental of $300 payable on June 1 of each succeeding calendar year, supplemented by monthly payments of 25 cents per ton of rock removed.

On November 18, 1971, plaintiffs were denied permission to survey and drill test a dolomite deposit for riprap rock. Thereafter, on May 2, 1972, plaintiffs for $5,000 purchased all of the reserved mineral interest in Tract 83, including the reversionary interest in the lease retained by the original owners-lessors.

After trial in 1977, the October 18, 1978, trial judge's opinion stated that there had been a temporary taking of plaintiffs' right to extract and remove dolomite, that the date of taking was November 18, 1971, and that just compensation for the property right temporarily taken was $23,250, with interest from November 18, 1971, to the date of payment. The October 17, 1979, opinion [1] of the Court of Claims determined that plaintiffs' mineral rights had been permanently abrogated by defendant, and remanded the case to the trial division for ascertainment of plaintiffs' damages. The court specifically refrained from any "intimation that any one method employed by any of plaintiffs' or defendant's experts for the purpose of determining just compensation has been adopted or approved by the court." The court also stated that "the value of plaintiffs' entire mineral interest was, in the absence of comparable sales, the fair market value of the minerals in place on the date of the taking."

The property interest that was taken on November 18, 1971, and which is to be valued in these proceedings on remand, is plaintiffs' leasehold interest, sometimes termed "operator's interest" or "working interest". Defendant has not contested plaintiffs' right to explore for and remove, under the 1941 and 1972 deeds, all oil, gas, asphaltum and other hydrocarbon substances, and other minerals including diatomaceous earth (except dolomite at a specific site on Tract 83). The value of plaintiffs' total reserved mineral interest on Tract 83 is not in issue. The property to be valued is the entire mineral interest in the right to extract and remove dolomite from a specific site. This value, the court stated, was to be determined on the basis of evidence already produced by the parties, plus any relevant, non-cumulative additional evidence which either party may desire to offer.

In further proceedings, plaintiffs argued that additional valuation evidence was needed to overcome deficiencies in the record that had been criticized in the trial judge's October 18, 1978, opinion. New evidence, it was claimed, would address credibility questions that resulted from a proliferation of expert witnesses, and the wide variation shown in the record in factors considered, techniques utilized and values ultimately advanced by the experts. Pursuant to plaintiffs' request, a second trial was held in January 1981; plaintiffs called nine witnesses and defendant called four witnesses. Posttrial briefing was completed January 15, 1982. On October 1, 1982, the case was transferred to the United States Claims Court pursuant to section 403(d) of the Federal Courts Improvement Act of 1982.[2]

Evidence relevant to valuation of plaintiffs' property interest in Tract 83 is contained in the records of both trial sessions.[3] In both trials, the parties' evidence was

---

1. *Foster v. United States,* 221 Ct.Cl. 412, 607 F.2d 943 (1979).

2. Pub.L. No. 97–164, § 403(d), 96 Stat. 25, 58 (1982).

3. Plaintiffs' valuation evidence primarily is included in testimony and exhibits of Dr. Donald W. Weaver, David McVay, William P. Schmidt, and Robert H. Paschall. Defendant's valuation evidence primarily is included in testimony and exhibits of Robert L. Chapman, Oliver W. Bowen, William R. Merrill, J.S. Ferguson, Jr., and C. William McClung.

based on the concept that the taking had been permanent. Notwithstanding the supplemental second trial, the parties' estimates of the value of the property taken continue to vary widely.

After the first trial, plaintiffs' final valuation of defendant's taking of a right of access to the Tract 83 deposits was $4,293,500; and defendant conceded that the denial of the right to extract and remove dolomite had a value of $23,250. After the second trial, plaintiffs' final claim is $5,029,532. During the second trial, defendant's appraisal expert, at different times, presented three values based on changing volume estimates: $126,000 (8,400,000 tons), $27,000 (1,800,000 tons), and $40–53,000 (2,650,000 tons). Defendant's final contention is that the property taken has a value of $23,250.

The findings of fact, and the final valuation of $28,000 for plaintiffs' property that was taken, is based upon the record compiled in both trial sessions.

## FACTS

I. The following findings of fact were incorporated in the October 18, 1978, opinion of the trial judge, and were not ruled upon by the United States Court of Claims in its October 17, 1979, opinion. These findings are consistent with the evidence adduced in the second trial and are adopted in this court.

1. Tract 83 contains approximately 876.26 acres; the dolomite deposit in issue on Tract 83 occupies approximately 22.54 acres. The deposit in issue appears on the surface as two bodies—an eastern body and a western body (hereinafter sometimes the "eastern deposit" and the "western deposit").

2. (a) Plaintiffs' geologist (Weaver), by interpretative mapping techniques, plotted the eastern deposit and the western deposit as single, unified masses. Defendant's geologist (Merrill), utilizing outcrop mapping techniques, plotted nine groups of deposits: groups A and B in the eastern body and groups C, D, E, F, G, H, and I in the western body. Group C was a collection of five separately delineated outcroppings.

Defendant's geologist acknowledged that groups A and B very probably were connected at depth and that group C possibly could be connected beneath the surface.

(b) The eastern deposit is approximately 1,800 feet along its southern boundary and approximately the same distance, although irregular or jagged, along its northern boundary. The eastern deposit varies from a maximum of 384 feet to a minimum of 180 feet in width, with an average width of approximately 300 feet. The eastern deposit probably has a depth of more than 100 feet and possibly may go down several hundred feet. Plaintiffs' geologist asserted that the western body was one continuous mass, approximately 2,400 feet long, and varying in width from 200 to 300 feet. Plaintiffs' expert estimated that the western deposit would extend at least to a 100-foot depth and probably to a much greater depth. Plaintiffs' geologist estimated that the eastern deposit encompassed an area of 444,000 square feet (or 10.19 acres) and, at a depth of 100 feet, contained a volume of 1,644,000 cubic yards; at a depth of 150 feet, the volume would be 2,467,000 cubic yards. The western deposit encompassed 538,000 square feet (or 12.35 acres). At a 100-foot depth, its volume would be 1,993,000 cubic yards; at a 150-foot depth, the volume would be 2,989,000 cubic yards. Total volumes, according to plaintiffs' estimates, for both deposits at the 100-foot depth would be 3,637,000 cubic yards and, at the 150-foot depth, 5,456,000 cubic yards.

(c) Both parties' experts agree that the two deposits lie between the Hondo fault to the south and the Monterey formation to the north. The Hondo fault separates deposits to the south that were formed in the Mesozoic period and are much older than either the subject deposits or the adjacent Monterey formation, which consists of a continuous sequence of dominantly siliceous shales, to the north. Plaintiffs' geologist depicted the Hondo fault as forming the southern boundary of the eastern deposit, coinciding with the southern boundary of the western deposit at its eastern end, and as lying from 100 to 200 feet south of the

remainder of the southern boundary of the western deposit. Defendant's geologists concur that the Hondo fault is in the general location depicted by plaintiffs' geologists, although one of defendant's geologists (Merrill) did not map the Hondo fault because it was not evidenced on the surface.

(d) The expert witnesses were in substantial disagreement as to the effects produced on the dolomite deposits by geologic activity along the Hondo fault. Plaintiffs' experts interpret the observable geologic phenomena as indicative of a series of faults perpendicular to the Hondo fault, which had fractured transversely a continuous dolomite deposit. Defendant's experts, on the other hand, interpret the same geologic phenomena as indications of extensive fracturing and churning of the dolomite deposits, with a resultant intermixture of heavily siliceous materials.

(e) One of defendant's geologists (Bowen) asserted that the deposits were breccia that consisted of at least six different kinds of rock, in effect "a group of fragments cemented together." He listed, as kinds of rock, dolomite, high calcium limestone, Monterey shale, pebbly magnesian limestone, solid quartz, massive quartz, and vein quartz, and characterized the deposits as a combination of rocks or a combination of minerals. The eastern deposit he identified as "silicified limestone breccia," in which the carbonate had been replaced by quartz; the western deposit to him had less brecciation and appeared to be more pure than the eastern deposit, but was shallow and lenticular. Both deposits, described as mixed rocks and not dolomite, were estimated to contain no more than 2 million tons of limestone or dolomite.

(f) Another of defendant's geologists (Merrill) identified the eastern deposit as consisting of heterogeneous carbonate rock, which he termed siliceous calcitic dolomite, and the western deposit as being composed of a series of lenticular bodies, in which other material, such as the Monterey platy shales, some sandstones, and other rocks were present. The western body was not viewed as a continuous body of carbonate rock, but it was possible that the lenticular bodies could go to depth, and that the western deposit approached, in some areas, a 95 percent purity in dolomite. Faulting and fracturing in the deposits made him doubt that any large-sized derrick stone could be produced, but the deposits would be suitable for production of medium-sized riprap. He estimated that the quantity of rock suitable for this purpose, in both deposits, would be approximately 1,695,230 tons.

(g) The Los Angeles District, Corps of Engineers geologist (Ferguson), reported the dolomite deposit as having an approximate overall length of 1,500 feet and a width varying from 500 to 1,000 feet. He questioned whether the deposit could produce substantial quantities of large-sized derrick stones. His February 25, 1976, report stated:

5. The most striking visual feature of this deposit are the close spaced joints as seen in the upper flanks of the outcrop. These joints have been caused by movement along the nearby Hond[o] Fault. It is then reasonable to assume that many of these open joints persist to some depth, thus raising doubt that this deposit is capable of producing sizeable quantities of large sized derrick stone or facing rock. However, the deposit may be suitable for production of rip rap 4″ to 12″ in size. * * *

(h) Defendant's quarry expert (Woodward) viewed the deposit as common rock, and not a mineral deposit, but concluded that the deposits presented no serious mining problems. His report states, in part:

There would be no serious mining problems. The deposit is quite accessible. The development of low faces (no higher than 30 ft.) could be done very easily. Most of the tonnage occurs above ground and there would be no stripping or wasting of material. The deposit could also be mined 50 ft. below grade. This would produce another 750,000 tons. However, this would mean that either about 224,000 tons of the 750,000 tons would have to be left in place or an additional 224,000 tons of rock would have to be mined in order

to develop the necessary slopes to meet the safety standards of the various governmental regulatory bodies, which would increase the cost accordingly.

(i) The eastern body has virtually no overburden and the site could be prepared for quarrying expeditiously. It is less obvious that the western body can be quarried economically; the western deposit, however, could be prepared for quarrying in less than a week.

(j) At least 1.5 to 2 million tons of mineral suitable for riprap purposes can be recovered from the Tract 83 deposits. The actual dimensions of the deposits and the volume of mineral that could be removed by conventional quarrying methods cannot be determined without further investigation, such as core drilling or test excavations.

3. (a) The Tract 83 deposits are suitable for use as hard rock in riprap and for similar uses in the construction industry. Stone used for riprap purposes may be classified by size (plaintiffs), as follows:

(1) 4″—12″ (filter stone and light erosion protection);

(2) 6″—18″;

(3) 12″—24″;

(4) 20″—40″; and

(5) derrick stone, 4′—7′ (6 to 20 tons); and by weight (defendant), as follows:

Small stone not of riprap size and less than 25 lbs.;
25—100 lbs.;
100—500 lbs.;
500—1000 lbs.;
1 ton—5 tons [derrick stone];
10 tons—20 tons [derrick stone].

(b) Derrick stone, used almost exclusively on breakwater and marine developments, is referred to, interchangeably, as "armor stone" or "capstone." In the Army Corps of Engineers' design memorandum for the Port San Luis, California, project, stone sizes are graded as Core Stone "C" (4-ton, 200-lb., 20-lb., 1-lb., and # 4-sieve sizes);

Core Stone "B" (4-ton, 1,000-lb., 200-lb., 20-lb., and 1-lb. sizes)' and capstone in eight sizes from A–3 to A–13. Capstone "A–3" stones have a 6-ton maximum, with not less than 50 percent by weight in pieces 3 tons or more and no stone less than 2 tons in weight; capstone "A–13" stones have a 22-ton maximum, with not less than 50 percent by weight in pieces 13 tons or more and no stone less than 7 tons in weight. The Army Corps of Engineers geologist testified that dolomite from Tract 83 would be within the perimeters of the specification guide for the Port San Luis, California, project.

(c) Other construction uses for which the Tract 83 deposits are suitable include aggregate, railroad ballast, roofing granules, terrazzo chips, asphalt concrete (blacktop), magnesian limestone for plaster, and decorative garden stone.

(d) Dolomite has the following additional uses:

Magnesium Refractories and Chemicals
 Dead-burned dolomite
 Periclase brick
 Chrome-magnesia brick
 Magnesium oxide
 Hydrated magnesia
 Magnesia pharmaceuticals
 Magnesium chemicals

\* \* \* \* \* \*

Agriculture
 Soil conditioner
 Animal and plant food
 Ingredient in insecticides and fungicides

Miscellaneous Uses
 Manufacture of glass
 Source of carbon dioxide
 Source of metallic magnesium[.]

(e) Consumption of dolomite in California in 1970 was estimated in Bulletin No. 194, California Division of Mines and Geology, "The Mineral Economics of the Carbonate Rocks" (1973), as follows:

| Use | 1970 | |
| --- | --- | --- |
| | Quantity in short tons | Value |
| 1. Magnesian Lime | 362,199 | $2,710,922 |
| 2. Concrete aggregate and road base | 50,212 | 109,033 |
| 3. Dead burned dolomite | 43,073 | 75,360 |
| 4. Magnesium chemicals | 27,468 | 130,473 |
| 5. Terrazzo chips | 23,363 | 446,160 |
| 6. Glass manufacturing | 21,503 | 88,347 |
| 7. Soil conditioners | 12,783 | 31,958 |
| 8. Refractory stone | 11,464 | 57,320 |
| 9. White surfacing | 10,608 | 31,739 |
| 10. Poultry grit | 8,126 | 24,378 |
| 11. Roofing granules | 3,208 | 42,987 |
| 12. Magnesium metal | 1,403 | 18,800 |
| 13. Steel flux | 943 | 2,358 |
| 14. Building stone | 469 | 3,865 |
| 15. Riprap | * | * |
| 16. Miscellaneous (mainly aggregates of unspecified type) | 31,514 | 52,807 |
| TOTALS | 608,336 + | $3,826,507 + |

* Not available for 1970; in 1969, quantity was 15,494 short tons, value was $32,235.

(f) Plaintiffs' appraisal expert (McVay) estimated the demand and market value of secondary uses for dolomite from the Santa Barbara-Los Angeles area as follows:

| | | |
| --- | --- | --- |
| A. | Soil supplement— | 5 tons/year |
| B. | Ceramics— | 96 tons/year |
| C. | Pharmaceuticals (deducting amount purchased from ceramic industry) | 40 tons/year |
| | TOTAL | 141 tons/year |

In order to capture this market it will be necessary to slightly undersell Kaiser Minerals of San Francisco:

Assuming lower price of $50/ton

141 tons/year @ $50/ton = $7,050.00/year

(g) The Tract 83 deposits contain mineral dolomite of sufficient purity for all primary and secondary uses listed in findings 3(a) through 3(f). Availability of markets for dolomite from Tract 83 for any of these uses, however, is dependent upon factors additional to chemical composition of the mineral deposits. All parties agree that the Tract 83 deposits would be suitable for use as riprap, including derrick stone, and other construction rock usages, but differ on quantities available and market demand for such uses.

4. (a) There is a market for riprap in the geographical area of Tract 83; such market is limited (1) by the distance over which stone can be hauled economically from its source and (2) the proximity of competing rock sources. The quantity of dolomite in the Tract 83 deposits suitable for riprap and other construction uses probably is sufficient to satisfy the demand that reasonably can be anticipated to arise in the next 25 years. Most riprap is used in connection with federal, state, and local government projects, and the larger sized derrick stone is used only in connection with marine projects such as ocean breakwaters. Very few successful rock quarries are based solely on production of riprap; fines, however, are produced as a byproduct of large stone production and are available for sale when there is a market. Plaintiffs' quarry expert (Schmidt) estimated that the Tract 83 dolomite deposits, when quarried in a fashion to produce a maximum amount of armor stone, would yield about 40 percent armor stone in the A–10 to A–13 sizes, and

about 60 percent smaller stone. Defendant's geology expert (Bowen) estimated the Tract 83 deposit could be expected to yield 40 to 50 percent riprap of all sizes, but under 5 percent of the 10-to-20 ton derrick stones when quarried in such a fashion.

(b) Armor stone is a premium size, and is difficult to produce in pieces 8 tons or larger. Quarries that are able to produce large armor stones in quantity are not numerous, and the geographical area within which armor stone competes is a much larger market area than the market are for the general run of quarry rock. The market area for armor stone, to be used in connection with any particular project, is dependent upon a number of factors, including size of project, number and capabilities of supply sources within an acceptable area, and modes of transportation available. Water transportation, when available, substantially extends the radius in which armor stone may be marketed. The geographical area within which armor stone is likely to find a market is substantially larger than the market area for smaller riprap from the same source.

(c) The primary trading area for the Tract 83 deposits, in which materials from that source would have a competitive advantage over materials from all other sources, would be limited to a radius of approximately 15 miles from the deposit. In general, the primary trading area would be limited to projects in the Lompoc, California, area. The geographical area within which the Tract 83 deposits would be competitive with other quarries would extend to a radius of from 50 to 55 miles for ordinary stone sales. For governmental projects that require armor stone, the market area in which the Tract 83 deposits could compete would extend to a radius of from 100 to 150 miles.

(d) Plaintiffs' appraisal expert (McVay) estimated the average demand for stone from the Tract 83 deposits as approximately 60,000 tons per year.

(e) Defendant's expert geologist on mineral economics of carbonate rocks (Bowen) estimated probable market demand in Santa Barbara County and vicinity, for 25 years, as follows:

| Commodity | Probable Market (Short Tons) |
|---|---|
| 1. Riprap [all sizes] | 2,000,000 plus |
| 2. Road Base (all types probably can be made from the Tract 83 stone) | 30,000,000 |
| 3. Asphalt Concrete (Blacktop) | 25,000,000 |

He estimated the amounts probably available from Tract 83, as follows:

| Commodity | Rock Probably Available from the Tract 83 Limestone Deposit | Percent of Available Rock |
|---|---|---|
| 1. Riprap | | |
| Small stone not of riprap size and less than 25 lbs. | 1,000,000 – 1,200,000 | 50 – 60 |
| 25–100 lbs. | 200,000 – 225,000 | 10 – 12 |
| 100–500 lbs. | 175,000 – 200,000 | 8 – 10 |
| 500–1000 lbs. | 100,000 – 120,000 | 5 – 7.5 |
| 1 ton – 5 tons | 100,000 – 150,000 | 5 – 7 |
| 5 tons–10 tons | 50,000 – 75,000 | 2.5 – 3.5 |
| 10 tons–20 tons | 25,000 – 30,000 | 1.5 – 2 |
| 2. Road Base (all types probably can be made from the Tract 83 stone | * | * |
| 3. Asphalt Concrete (Blacktop) | * | * |
| * Not estimated | | |

(f) On the basis of historical use data and future growth predictions, defendant's appraisal expert (Chapman) estimated the potential demand for rock products in the Lompoc trade area, both riprap and aggregate, and projected a demand for material

from the Tract 83 deposits at an annual average of 10,000 tons, as follows:

### POTENTIAL DEMAND FOR SUBJECT PROPERTY TRADE AREA

#### (15 Mile Radius)

| | |
|---|---|
| 1970 | 18,000 Tons |
| 1974 | 12,000 Tons |
| 1977 | 15,000 Tons |

### PROJECT DEMAND FOR SUBJECT PROPERTY ROCK:

10,000 TONS PER ANNUM (Average)

### SUMMARY OF DEMAND ANALYSIS:

Lompoc Area – Rip-Rap Rock

Demand: 25,000 ± Tons in 5 ± Year Intervals

Lompoc Area – Aggregate Rock –
(Excluding use in Concrete)

| Method: (Projection) | MEAN ANNUAL TONNAGE: |
|---|---|
| Kaiser – Per Capita | 13,000 ± |
| Lompoc Building Permit | 6,500 ± |
| County Per Capita | 13,000 ± |
| Opinion Poll | 13,000 ± |
| | 10,000 ± |
| | 2,500 – 5,000 ± |

Based upon our extensive market investigation, it is our opinion that the subject dolomite site would have the following probable demand for its rock products:

### SUBJECT—ROCK DEMAND:

| | |
|---|---|
| Lompoc Area Demand | 13,000 ± Tons |
| Subject—50% Market | × .50 |
| | 6,500 ± Tons annually- |
| Capture Rate | Aggregate Rock |
| Lompoc Rip-Rap | 25,000 ± Tons in 5 ± |
| Demand | Year Intervals |

His analysis to determine the projected demand postulated an intermittent demand for riprap at 25,000 tons, at 5-year intervals, and an annual capture of the market for aggregate of 6,500 tons. Special projects might increase the annual average demand for all uses to approximately 11,500 tons from the Tract 83 deposits. His summary was as follows:

5. (a) Defendant's appraisal expert (Chapman) surveyed royalties paid to owners of eight active rock quarries within a competitive range of the subject deposit and found that the range of royalty payments was from 10 cents to 25 cents per ton for typical quarry operations, and that the royalties could go as high as $1 a ton for specific rock sizes and smaller tonnages.

(b) Plaintiffs' appraisal expert (McVay) submitted information that royalties paid to holders of mineral rights for riprap varied from 25 cents per ton to $1.05 per ton, as follows:

| Quarry | Rock Size | Royalty Per Ton |
|---|---|---|
| Missile City Quarry, Lompoc | Up to 50 Lbs. | 25¢ |
| | 50 Lbs. – 1 Ton | 50¢ (1968) |
| | Over One Ton | $1.00 |
| San Julian Ranch, 10 miles south of Lompoc | All Sizes | 25¢ (1970) |
| Soledad Quarry Saugus | All Sizes | 25¢ (1965) |

| Quarry | Rock Size | Royalty Per Ton |
|---|---|---|
| Ducor Quarry Bakersfield | All Sizes | 25¢ (1971) 45¢ (1974) |
| Elephant Mountain Quarry, Barstow | All Sizes | $1.05 (1974) |
| Opinion of Alex Madonna | All Sizes | 25¢ (1971) 50¢ (1976) |

(c) Plaintiffs' quarry operator (Schmidt) testified that, in the Lompoc-Vandenberg area, he had paid $3 per ton at the El Jaro quarry and $2.75 per ton at the Santa Margarita quarry in 1976.

6. (a) Between 1971 and 1977, there were several construction projects completed for which, if operative, a quarry at the Tract 83 deposits would have been able to compete. These projects included:

The waste water treatment plant at Lompoc—35,000 tons of stone;

Parking lot at Port San Luis—substantial tonnage;

The atomic reactor electric generating plant at Diablo Canyon—substantial tonnage; and

The Rincon highway project—25,000 tons of armor stone supplied by Riverside quarry, which was approximately 145 miles from the Rincon site.

(b) Future large-scale projects upon which a quarry at the Tract 83 deposits would be in a position to bid competitively, include the following:

(1) Port San Luis Obispo harbor breakwater project (Avila)—anticipated demand of from 600,000 to 1 million tons of riprap of various sizes and 135,000 tons of size A–13 armor stone; and

(2) Liquified Natural Gas (LNG) project proposed at Point Conception, involving two breakwaters—estimated demand for 110,000 tons of stone.

7. (a) Plaintiffs' appraisal expert (McVay) found no comparable sales on which to base a valuation of the Tract 83 deposits on the traditional market data approach. He made two separate value determinations:

(1) Royalty interest, defined as the amount paid to the owner to give up the right to mine the mineral, valued by capitalization of income; and

(2) Operator's interest, defined as the value of the mineral interest in the hands of the quarry operator (as distinguished from a passive landowner, who would extract only a royalty).

McVay utilized the volumes projected by plaintiffs' geology experts, i.e., 13,094,000 tons, when mined to a depth of 100 feet (3,637,000 cubic yards).

(b) McVay's valuation of the royalty interest applied the following factors: A 25-cent royalty charge; an estimated production tonnage of 60,000 tons per year; a geographic market area within a radius of 50–55 miles from the dolomite deposit; a discount rate of 17 percent; and a 25-year life. On the basis of these factors, McVay appraised the value of the dolomite royalty interest as of November 18, 1971, at $195,000 and, as of January 4, 1977, at $290,000. This appraisal attributed no value to any oil or gas rights.

(c) McVay's estimate of the operator's interest, on the basis of the Port San Luis project, was computed as follows:

OPERATOR'S INTEREST ESTIMATE:
\* \* \* \* \*

Type of rock – Armor (A–10 and A–13)
Period of delivery – Projected 1977–78–79
Quantity: A–13 202,872 tons
A–10 12,600 tons
Total 215,472 tons

PRICE PER TON DELIVERED BASED ON CORPS OF ENGINEERS 1975 PRICE ESTIMATES.\*

A–13: $17.40 (Riverside)
A–13 and A–10: $11.00
Truck cost per ton from subject – $ 5.09
Production cost estimate per ton for subject – $ 2.50
Royalty per ton – $ 1.00

OPERATOR'S INTEREST CALCULATIONS:

| | |
|---|---|
| Projected price per ton delivered | – $17.00 |
| Less truck costs per ton from subject | – 5.09 |
| Less royalty per ton | – 1.00 |
| Less production costs per ton (blasting, sizing and loading) | – 2.50 |
| Indicated Operator's interest per ton | – $ 8.41 |

| | | |
|---|---|---|
| 215,472 tons at $8.41 | = | $1,812,120 |
| Operator's interest estimate | = | $1,812,000 |

\* Since the Corps of Engineers price estimates were based on 1975 prices, the actual 1977 bid prices are expected to be materially higher.

(d) McVay's 1971 estimated valuation of the operator's interest on the basis of the Rincon project was:

OPERATOR'S INTEREST ESTIMATE:

\*　　\*　　\*　　\*　　\*　　\*

Type of Rock—Armor (A–12)

Period of Delivery—November, 1971 to February, 1972

Quantity—25,000 tons

Price per ton delivered—$9.80

Truck Cost per ton—$5.80 (4 ¢ per mile @ 145 miles)

Subject Estimate Production Cost per ton —$1.50

Royalty per ton—25 ¢

OPERATOR'S INTEREST CALCULATIONS:

Had the armor rock been available from the subject deposit, a competitive bid delivered of $9.00 per ton would be considered reasonable.

| | | |
|---|---|---|
| Projected price per ton delivered | – | $ 9.00 |
| Less truck costs (75 mi at 4¢/mi) | – | 3.00 |
| Less royalty per ton | – | .25 |
| Less production costs per ton (such as blasting, sizing and loading) | – | 1.50 |
| Indicated Operator's interest per ton | – | $ 4.25 |

| | | |
|---|---|---|
| 25,000 tons at $4.25 | = | $106,250 |
| Operator's interest estimate | = | $106,000 |

(e) Plaintiffs' hard rock quarry operator, William Schmidt, computed the value of the operator's interest as of the date of trial by a calculation of a proposed bid for the Port San Luis Obispo harbor project. This evaluation of the operator's interest was based on a calculation that compared the cost of delivering armor stone to the Port San Luis project, using the Tract 83 deposits, in comparison to the cost if the armor stone were brought from the Riverside quarry. Schmidt computed that armor stone from the Tract 83 deposit could be delivered to the Port San Luis project at a cost of $11.50 per ton. Armor stone delivered to the project from the Riverside quarry was estimated to cost approximately $28.36. Schmidt compared the projected bid prices and computed total profit on 215,000 tons of armor stone, as follows:

| | | |
|---|---|---|
| 1. | From Riverside, FOB Avila | $28.36/Ton |
| 2. | Cost from Tract 83 to Avila | 11.50/Ton |
| | Advantage of Tract 83 | 16.86/Ton |

Tract 83 can therefore bid at estimated price per ton of $25/Ton (in order to underbid Riverside's bid of $28.35) for following profit on 215,000 tons of derrick stone:

| | |
|---|---|
| $2.00/Ton profit × 215,000 Tons (included in "Cost" bid of $11.50/Ton | $430,000 |
| Additional profit which can still underbid Riverside ($25.00 bid less $11.50 cost) or $13.50/Ton × 215,000 Tons | 2,902,500 |
| Total Operator's Profit | $3,332,500 |
| Plus $1.00/Ton royalty allocable to royalty approach | 215,000 |
| Total Profit on Port San Luis job on just the 215,000 Tons armor | $3,547,500 |

(f) Schmidt also projected the value of 320,000 tons of core stone as a byproduct of the production of derrick stone. In this comparison, Schmidt related the costs of core stone from the Tract 83 deposits to the cost of core stone from Kaiser's Santa Margarita quarry. The comparison was:

| | Kaiser at 28 miles | Tract 83 at 55 miles |
|---|---|---|
| Freight (PUC rate) | $3.00 | $4.75 |
| Blasting and sorting | 1.00 | –0– \* |
| Loading | .50 | .50 |
| Royalty | 1.00 | 1.00 |
| Profit | 2.00 | 1.00 |
| BID | 7.50 | 7.25 |

Armor (A–10 and 13) Stone 40% of each quarry shot at Tract 83 . . . . . . . 215,000 Ton

Core (A–6 and below) 60% of each quarry shot at Tract 83 . . . . . . . 320,000 Ton

* (Cost of blasting A–6 and below for the first 320,000 ton is included in the price for A–13 derrick [armor] stone computed on preceding exhibit.)

Value of 320,000 tons of core stone which is by-product (at no overhead) from production of derrick stone, using $7.25 bid (including $1.00/Ton profit and $1.00/Ton royalty shown above):

320,000 Tons core rock at $2.00/Ton for Additional Operator's Interest of............................ $640,000.00

8. (a) In the determination of the separate value of the Tract 83 deposits, defendant's appraiser (Chapman) considered only values for riprap and aggregate uses. Potential uses for chemical dolomite, or for pharmaceutical or agricultural purposes, were not included in defendant's appraiser's valuation. Use as aggregate was limited to roadbase; the Tract 83 deposits were not considered for use in roadbed concrete.

(b) Demand for riprap and aggregate from the Tract 83 deposits was related to a consideration of supply available from production of eight active quarries in the San Luis Obispo-Santa Barbara-Ventura Counties, 12 inactive quarries in those counties, and 17 sites of potential riprap deposits containing either limestone or dolomite. Estimated reserves in these possible alternative sources of riprap were included in the analysis. Appraisal expert Chapman concluded that there was an adequate supply of all rock products in the counties of San Luis Obispo and Santa Barbara to handle any future demand that could arise. The trading area, based on transportation costs for riprap and aggregate, should be limited to the two counties of San Luis Obispo and Santa Barbara; the primary trading area for the Tract 83 deposits for riprap and aggregate was a 15-mile radius of the site.

(c) Defendant's expert (Chapman) made a transportation cost feasibility study, which rated the Tract 83 deposits with alternate rock sources on the basis of constructive transportation costs (not actual costs) for five projects. Four projects had been completed (Diablo Canyon, Rincon, Arco Island, and Lompoc sewer) and one project was planned (Port San Luis Obispo). Defendant's transportation cost feasibility study showed, for the four completed projects, that the Tract 83 deposits would have

—ranked No. 7 among nine competitive sources on the Diablo project;

—ranked No. 3 among four competitive sources on the Lompoc sewer project;

—ranked No. 6 among six competitive sources on the Rincon project; and

—ranked No. 6 among six competitive sources on the Arco Island project.

(d) Valuations by application of the income approach were determined by defendant's appraisal expert through three cash flow analyses. A value of $29,088 was derived on the basis of Chapman's original appraisal premise and included the following conditions:

* * * 25 year lease started March 1, 1976. $4,500 per year base royalty. All sizes rock quarried @ 0.3125/Ton. Minimum of 14,400 tons must be quarried to reach base minimum. Lessee to pay taxes on mineral rights. It is assumed that minimum royalty is never exceeded.

A value of $33,000 was derived in a second cash flow analysis, based on an average annual demand of 10,346 tons per year, and a sporadic demand for riprap that caused the minimum royalty to be exceeded at 5-year intervals. Other conditions were: Owner negotiates with quarry operator a 25-year lease at 0.3125 per ton (all rock); minimum rent of $4,500 per year, discounted at 15 percent to present worth value. This model was based on a 100 percent capture of the riprap demand in the Lompoc area.

The third cash flow analysis produced a value of $24,000. In this model, although the quarry would remain open, it would be inactive between short-term lease contracts that were negotiated separately during the 25-year period. Demand was an average of 10,346 tons per year, with sporadic demand for riprap at 5-year intervals. Royalty

rates for riprap increased over the 25-year period. Royalty was discounted at 18 percent because of the higher risks involved in an irregular cash flow. Royalty for riprap was $1 per ton in 1976, and was compounded at 5 percent annually. Royalty on aggregate was 25 cents per ton in 1976.

(e) Defendant's expert (Chapman) determined the fair market value of the entire fee of Tract 83 as of November 18, 1971, and as of March 1, 1976, on the basis of comparable sales. These values were as follows:

| | |
|---|---|
| November 18, 1971 | $ 307,000 |
| March 1, 1976 | $ 350,000 |

(f) The following table summarizes the various approaches made by defendant's appraisal expert to valuation of the mineral rights reserved on Tract 83:

MARKET DATA APPROACH:

Indicates Value Range of $5,000 to $29,000

INCOME APPROACH:

| | |
|---|---|
| 1971 Value | $ 32,000 |
| 1976 Value | $ 38,000 |

FINAL OPINION OF VALUE:

1971 Value:

| | |
|---|---|
| Right to Extract Dolomite | $23,250 |
| Right to Extract Oil & Gas | $ 8,750 |

1976 Value:

| | |
|---|---|
| Right to Extract Dolomite | $29,250 |
| Right to Extract Oil & Gas | $ 8,750 |

9. Defendant's geology experts also provided economic analyses of the value of the Tract 83 deposits. Bowen's analysis, based on a consideration that there would be 2 million tons of dolomite worth 2 cents a ton in place, valued the dolomite deposits at a total of $40,000, and provided an additional $10,000 for serpentine. No valuation was placed on rights to petroleum or related materials. In Bowen's analysis, the fair market value of the economically recoverable rock on Tract 83, thus, would not exceed $50,000. Merrill's analysis of the market value of the right to mine and remove the Tract 83 deposits utilized procedures in the assessor's handbook, "Evaluation of Mines and Quarries," published by the Assessment Standards Division, Property Tax Department, California State Board of Equalization, January 1973. This procedure placed the value on the right to extract and remove the rock, not a value based on the volume of the rock deposit, which Merrill had estimated to be 1,659,230 tons. On the basis of a demand for 10,000 tons per annum, at a royalty rate of 15 cents per ton, escalated at a rate of 2 cents per ton annually for 25 years, Merrill valued dolomite, limestone, and other quarryable products in the Tract 83 deposits, as of March 1, 1976, at $25,493. The value, when computed by this procedure, as of November 18, 1971, was $18,560.

10. The term dolomite, in popular usage, describes both pure mineral dolomite and a rock in which the mineral dolomite is the primary constituent. A rock composed of from 85 percent to 95 percent pure mineral dolomite in popular commercial usage would be classified as dolomite.

11. The Tract 83 deposits in dispute contain rock dolomite that is suitable for use as riprap, including the production of armor stone and for other construction uses, and mineral dolomite of sufficient purity for pharmaceutical, agricultural and other specialized secondary uses.

II. The following findings of fact are based on evidence presented at the January 1981 trial; they supplement the findings of fact in I. above.

12. Samples from Tract 83 tested by plaintiffs show that concrete aggregate made from Tract 83 rock would be stronger than concrete aggregate made with river gravel, and that less cement was required with Tract 83 rock to produce concrete aggregate of equal strength. Plaintiffs' tests disclosed no reactivity when the Tract 83 rock samples were mixed with cement.

13. (a) Defendant's geology expert (Bowen) believed the presence of Monterey shale made rock from Tract 83 unsuitable for concrete, and that a mixture of Monterey shale with the Tract 83 dolomite rock was unavoidable. Defendant's appraisal expert (McClung) assumed that Tract 83

would be suitable for use in concrete aggregate. No evidence shows affirmatively that Tract 83 rock would not be suitable for use in concrete aggregate.

(b) Plaintiffs' tests on Tract 83 samples and Missile City quarry samples indicate that the two deposits have substantially the same rock, both mineralogically and chemically. Missile City quarry rock was suitable for concrete and was used satisfactorily in construction at Vandenberg Air Force Base.

14. Plaintiffs' tests on Tract 83 samples show that the presence of quartz in the rock would not prevent its use for concrete aggregate. The presence of quartz is not deleterious for riprap use.

15. Cubic yards of dolomite can be converted into tonnage volumes by multiplying the cubic yardage by a factor related to the specific gravity of dolomite. On the average, dolomite weighs 2.3 tons per cubic yard. Plaintiff's estimate of the total volume of the eastern and western deposits was 3,637,000 cubic yards at the 100 foot depth, which converts to 8,365,100 tons; the 5,456,000 cubic yards at the 150 foot depth converts to 12,548,800 tons.

16. A quarry on Tract 83 would present no serious mining problems. It would be simple in start-up, and there would be very little overburden to be removed. Waste could be disposed of on the site. Jack Foster testified that his mining plan for a Tract 83 quarry would use a benched quarry face, with 30 foot vertical faces and 6 foot horizontal benches between each vertical face.

17. Access to the Tract 83 quarry site would be by LaSalle Canyon Road from the deposit to the northern boundary of Vandenberg Air Force Base, a road distance of approximately 1.9 miles. The steepest part of the road, approximately 0.25 miles, has a grade of approximately 18 percent; on the remainder the grade is between 8 and 10 percent. Plaintiffs' quarry operator (Sanchez) estimated the LaSalle Canyon Road could be upgraded into a basic two lane road suitable for hauling rock at a cost in 1981 dollars of $10,440; a road with an all-weather surface could be provided at a cost in 1981 dollars of $27,840. Converted to November 1971 dollars, these estimates amount to $6,264 for basic grading and widening, and to $16,704 for an all weather surface.

18. There is a general shortage of high quality rock suitable for riprap in the Santa Maria area, and of high grade construction rock in Santa Barbara County. Broken concrete on occasion has been used as a substitute for hard rock riprap. The United States Soil Conservation Service during 1979 had the bank of the Santa Ynez River near Lompoc lined with gabions in lieu of riprap. Gabions are wire baskets, used for stream bank protection, into which smaller rocks are placed by hand.

19. Environmental concerns restrict the operation of existing quarries and hinder opening of new quarries in Santa Barbara County and San Luis Obispo County. Operations at the Sea Canyon quarry and the Morro Rock quarry were stopped after the 1969 floods because of environmental objections. The Ojai quarry was shut down for a year pending issuance of a conditional use permit from the City of Ventura.

20. (a) Plaintiffs' appraisal expert (Paschall) valued the leasehold interest for use of dolomite as riprap and concrete grade aggregate on the taking date at $4,221,000, plus a residual mineral right value of $498,000 for use of dolomite for agricultural purposes. This value was based on a capitalization of income methodology in which a projected future income stream was realized over a 25-year period. Paschall estimated the total market demand for Tract 83 production over the 25-year period to be 4,237,884 tons for riprap and aggregate and 205,921 tons for agricultural uses. A 25-year period, beginning January 1972, was used as the productive life of Tract 83 for economic reasons, and was not related to actual volume of reserves available, because his residual appraisal technique used a capitalized income approach that captured virtually all of the value in the first 25 years.

(b) Paschall's valuation included the following calculations: per capita demand of the State of California for stone and concrete aggregate during the period 1967–71 was derived from a correlation of production with population; per capita demand was applied to estimated population growth in a designated market area to derive total demand for the market area; Tract 83 percentage capture of total market demand for each year 1972–96 was derived from a consideration of the capacity and transportation advantage of available competitors; Tract 83 production was equated with market share captured; annual net operating income from Tract 83 production was calculated from a basic price per ton of rock at the quarry in 1971 of $4 and a basic price per ton of $1.75 for aggregate, less a total operating expense of $0.90 per ton and a royalty of $0.25 per ton; fixed plant and mobile equipment were estimated at $879,000. The computation of total property value consisted of multiplying a given net operating income per year by its applicable production rate year by year and then multiplying the total net operating income per year by the relevant present worth factor for a 10.5 percent rate of return. This procedure produced a total property value of $5,100,000, from which is deducted $879,000 for plant and equipment, to give the final value of $4,221,000 for stone and aggregate.

(c) Paschall derived the average per capita demand for stone suitable for use as riprap of 2.06 tons by correlating California production in the years 1967–71 with State of California population, as follows:

| Year | Tons of Stone Produced (1000s) | Population (1000s) | Tons per Capita |
|---|---|---|---|
| 1967 | 37,186 | 18,588 | 2.00 |
| 1968 | 36,125 | 19,038 | 1.90 |
| 1969 | 38,033 | 19,499 | 1.95 |
| 1970 | 46,399 | 19,971 | 2.32 |
| 1971 | 43,615 | 20,256 | 2.15 |
| | | | 2.06 average |

Paschall derived the average per capita demand for aggregate of 2.76 tons by multiplying statewide annual cement production by six and by correlating that tonnage with state population, as follows:

| Year | Tons of Cement Produced | Tons of Aggregate Needed at 6:1 Mix (1000s) | Population (1000s) | Tons per Capita |
|---|---|---|---|---|
| 1967 | 37,186 | 47,406 | 18,588 | 2.55 |
| 1968 | 36,125 | 53,784 | 19,038 | 2.82 |
| 1969 | 38,033 | 57,078 | 19,499 | 2.93 |
| 1970 | 46,399 | 55,824 | 19,971 | 2.80 |
| 1971 | 43,615 | 54,702 | 20,256 | 2.70 |
| | | | | 2.76 average |

(d) Geographic markets for concrete grade aggregate and riprap for Tract 83 dolomite were defined as follows:

(1) Santa Barbara's "North County" which consists of all of the county north of the Santa Ynez mountains, and

(2) other adjacent areas that would have been logical prospects for the use of Tract 83's mineral commodity.

The North County included two sub-markets:

(i) "Lompoc Valley" (City of Lompoc, Vandenberg Village, Vandenberg Air Force Base, and Mission Hills) and

(ii) other North County (Buellton-Solvang-Santa Ynez, and Santa Maria and all other areas north of the Santa Ynez mountains).

(e) Paschall obtained population figures for Lompoc Valley as of 1979 and a population figure for the total North County as of 1970. These were adjusted to obtain an estimate for January 1972, which was then escalated to reflect an annual 2.42 percentage rate of increase exhibited by the entire State from 1960 to 1970. This procedure produced a population for Lompoc Valley and for North County for each year 1972–96. The Lompoc Valley population was projected to increase from 41,560 in 1972 to 73,780 in 1996; North County population was projected to increase from 119,480 in 1972 to 212,090 in 1996. Application of the 2.76 average tons per capita for aggregate and 2.06 average tons per capita for stone produced a total demand estimate for each

year for "Lompoc Valley" and for "Other North County" markets, as follows:

| | AGGREGATE (Tons) | | STONE (Tons) | |
|---|---|---|---|---|
| | Lompoc Valley | North County except Lompoc Valley | Lompoc Valley | North County except Lompoc Valley |
| 1972 | 114,705 | 215,055 | 85,610 | 160,690 |
| 1973 | 117,490 | 220,250 | 87,490 | 164,590 |
| 1974 | 120,310 | 225,600 | 89,800 | 168,380 |
| 1975 | 123,230 | 231,040 | 91,980 | 172,440 |
| 1976 | 126,210 | 236,650 | 94,200 | 176,630 |
| 1977 | 129,280 | 242,350 | 96,490 | 180,890 |
| 1978 | 132,400 | 248,230 | 98,820 | 185,270 |
| 1979 | 135,630 | 254,220 | 101,230 | 189,750 |
| 1980 | 138,880 | 260,410 | 103,660 | 194,360 |
| 1981 | 142,250 | 266,700 | 106,170 | 199,060 |
| 1982 | 145,700 | 273,130 | 108,750 | 203,850 |
| 1983 | 149,200 | 279,790 | 111,360 | 208,830 |
| 1984 | 152,820 | 286,540 | 114,060 | 213,870 |
| 1985 | 156,520 | 293,470 | 116,820 | 219,040 |
| 1986 | 160,300 | 300,590 | 119,640 | 224,360 |
| 1987 | 164,190 | 307,850 | 122,550 | 229,770 |
| 1988 | 166,680 | 316,790 | 125,520 | 235,330 |
| 1989 | 172,220 | 322,920 | 128,540 | 241,020 |
| 1990 | 176,360 | 330,790 | 131,630 | 246,880 |
| 1991 | 180,670 | 338,730 | 134,850 | 252,820 |
| 1992 | 185,060 | 346,930 | 138,120 | 258,940 |
| 1993 | 189,530 | 355,320 | 141,460 | 265,200 |
| 1994 | 194,110 | 363,930 | 144,880 | 271,630 |
| 1995 | 198,800 | 372,740 | 148,380 | 278,200 |
| 1996 | 203,630 | 386,570 | 151,990 | 284,910 |

(f) Paschall estimated total demand in tons for the years 1972–96 as follows:

| | Total Concrete Aggregate | Total Stone | Total Non-Concrete Aggregate |
|---|---|---|---|
| Lompoc Valley | 3,876,137 | 2,894,000 | 5,486,654 |
| Other North County | 7,267,374 | 5,426,710 | 10,286,669 |
| Totals (Tons) | 11,143,511 | 8,320,710 | 15,773,323 |

(g) Paschall estimated that Tract 83 production could capture the following shares in the respective markets:

| | Stone (Riprap) | Aggregate |
|---|---|---|
| Lompoc Valley | 50% | 30% |
| Other North County | 20% | |
| Outside North County | 50% of Other North County | |

(h) Demand for Tract 83 production, based on Paschall's market shares, for the 1972–96 period was:

### TOTAL DEMAND FOR TRACT 83 PRODUCTION (TONS)

| AGGREGATE | STONE (RIPRAP) | | | TOTAL TRACT 83 |
|---|---|---|---|---|
| Lompoc Valley | Lompoc Valley | Other No. County | Outside No. County | |
| (30%) | (50%) | (20%) | (50% of other No. County) | |
| 1,162,871 | 1,447,000 | 1,085,342 | 542,671 | 4,237,884 |

(i) Paschall derived prices for riprap stone from statistical data, and calculated a basic price per ton for rock at the quarry in 1971 at approximately $4. On the basis of a "transportation advantage" enjoyed by Tract 83 over competing quarries he calculated prices at the quarry site for Tract 83 production in the following markets for stone as follows:

| | |
|---|---|
| Lompoc Valley | $ 6.25 |
| Other North County | $ 5.75 |
| Outside North County | $ 5.75 |

The price for Tract 83 aggregate at the quarry was estimated to be $1.75.

(j) Paschall's computation of net operating income per ton for Tract 83 production was:

| Area and Product | Sale Price | Oper. Expens. | Royalty | NOI |
|---|---|---|---|---|
| Lompoc Valley Aggregate | $1.75 | $0.90 | $0.25 | $0.60 |
| Lompoc Valley rock | 6.25 | 0.90 | 0.25 | 5.10 |
| Other No. County rock | 5.75 | 0.90 | 0.25 | 4.60 |
| Outside No. County rock | 5.75 | 0.90 | 0.25 | 4.60 |

(k) Paschall calculated the total net income from Tract 83 production annually for 1972–96, and obtained a present worth value by application of factors for a 10.5 percent rate of return:

## VALUE OF TRACT 83 NET OPERATING INCOME

| | Total Net Operating Income | Present Worth Factors at 10.5% | Present Worth of Net Operating Income |
|---|---|---|---|
| 1972 | $460,703 | .951 | $ 438,128 |
| 1973 | 471,382 | .861 | 405,860 |
| 1974 | 483,011 | .779 | 376,265 |
| 1975 | 494,513 | .705 | 348,632 |
| 1976 | 506,363 | .638 | 323,060 |
| 1977 | 518,948 | .577 | 299,433 |
| 1978 | 531,495 | .522 | 277,440 |
| 1979 | 544,404 | .473 | 257,503 |
| 1980 | 557,537 | .428 | 238,626 |
| 1981 | 571,041 | .387 | 220,993 |
| 1982 | 584,851 | .351 | 205,283 |
| 1983 | 599,010 | .318 | 190,485 |
| 1984 | 613,501 | .288 | 176,688 |
| 1985 | 628,340 | .260 | 163,368 |
| 1986 | 643,552 | .236 | 151,878 |
| 1987 | 659,138 | .213 | 140,396 |
| 1988 | 674,834 | .194 | 130,918 |
| 1989 | 691,384 | .175 | 120,992 |
| 1990 | 708,096 | .158 | 111,879 |
| 1991 | 725,280 | .144 | 104,440 |
| 1992 | 742,854 | .130 | 96,571 |
| 1993 | 760,814 | .118 | 89,776 |
| 1994 | 778,819 | .107 | 83,333 |
| 1995 | 798,069 | .096 | 76,615 |
| 1996 | 817,402 | .088 | 71,931 |
| | | | 5,100,493 |
| | | Rounded to | $5,100,000 |

(1) Paschall's estimate of the total cost of fixed plant and equipment for operations at Tract 83 was:

| | | |
|---|---|---|
| Fixed Plant | | $ 250,000 |
| Equipment: | | |
| Drilling Rig, et al. | 98,000 | |
| Power Shovel | 154,000 | |
| Heavy-Duty Loader | 127,000 | |
| One 35-ton Truck | 42,000 | |
| D–8 Cat with Blade | 35,000 | |
| | | 456,000 |
| Total Plant and Equipment | | $706,000 |

This estimate was revised to provide for the addition of a 20-ton crane ($118,000), small vehicles and miscellaneous tools ($43,000) and the inclusion of costs for repairing the road ($12,000), a total addition of $173,000.

(m) Paschall's final residual mineral right value for stone and aggregate uses ($4,221,-000) was obtained by deducting from the present value of the net operating income ($5,100,000), the revised estimate for the value of the plant and equipment ($879,-000).

21. In posttrial briefing, plaintiff's final computation of value of the property taken is as follows:

| | |
|---|---|
| Gross value of the dolomite, utilizing the capitalized income approach to value, for riprap and aggregate uses . . . . . . . . . . . . . . . . . . . . | $ 5,100,000 |
| LESS cost of crushing plant and other equipment . . . . . . . . . . . . . . . . . . . . | – 877,000 |
| SUBTOTAL | $ 4,223,000 |
| LESS 1971 cost of improving LaSalle Canyon Road ($6,264 + $16,704) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – 22,968 |
| SUBTOTAL for riprap and aggregate | $ 4,200,032 |

PLUS:

Royalty interest value ........................................$ 331,500
Agricultural use value .........................................498,000

TOTAL VALUE of dolomite, in place, as of the
November 18, 1971, date of taking ..............................$ 5,029,532

22. (a) Defendant's mining and appraisal expert (McClung) considered the Tract 83 deposits to be suitable only for use as common variety stone. Other uses could be obtained only by selective mining, which could not be justified because of expense and the size of the deposits. He calculated the fair market value by multiplying estimated reserves at Tract 83 by $0.015 per ton. The value factor of 1.5 cents was based upon five sales and one condemnation sale of rock deposits in California between 1962 and 1977 at prices between 0.15 cents and 6.0 cents per ton. McClung's comparable sales, with prices indexed to 1971 were:

| Sale No. | Tons Reserve, Category | Date of Sale | Price (¢)/Ton Total Reserve Date of Sale | Indexed to 1971 |
|---|---|---|---|---|
| 1. | 10MM Inferred | 1972 | 1.86 | 1.6 |
| 2. | 200 MM Inferred | 1971 | 0.15 | 0.15 |
| 3. | 12 MM Inferred | 1962 | 2.12 | 2.59 |
| 4. | 10 MM Inferred & Indicated | 1972 | 6.0* | 5.81 |
| 5. | 24 MM Inferred | 1973 | 1.0 | 0.94 |
| 6. | 100 MM Inferred | 1976 | 1.4 | 0.89 |

* Operating plant with kiln, estimated to represent approximately one third of selling price, included in price/ton total reserve.

(b) Other data relative to these sales compiled by McClung is summarized in the following table:

COMPARABLE SALES DATA

| Description | Sale No. 1 | Sale No. 2 | Sale No. 3 | Sale No. 4 | Sale No. 5 | Sale No. 6* |
|---|---|---|---|---|---|---|
| Tons Reserves (MM): | | | | | | |
| Limestone | 10 | 200 | 12 | | 24 | 10 |
| Dolomite | | | | 10 | | |
| Mining Method | Quarry & Mine | Quarry | Quarry | Quarry & Mine | Quarry | Quarry |
| In Production | No | No | No | Yes | Yes | Yes |
| Selective Mining Required | Yes | Yes | Yes | Yes | Yes | |
| Rail & Road | Good | Good | Good | Good | Good | |
| Power & Water At Site | No | No | No | Yes | Yes | |
| Services & Labor | Distant | Nearby | Nearby | Good | Nearby | |
| Acreage | 280 | 1100 | 1592 | 350 | 208 | 144 |
| Date of Sale | 1972 | 1971 | 1962 | 1972 | 1973 | 1976 |
| Price/Ton Total Reserves | 1.86¢ | 0.15¢ | 2.12¢ | 6.0¢** | 1.0¢ | 1.4¢ |

* Condemnation Appraisal.
** Plant included in sale.
NOTE: All sales in California.

(c) McClung considered $0.015 per ton value for total reserves of dolomite in place to be the more accurate measure of value, but conceded that $0.02 per ton could be justified. McClung's valuations varied with changes in estimates of total recoverable tonnages available. Estimates of the quantity of dolomite on Tract 83 were considered to be inadequate bases for firm conclusions.

McClung classified the reserves as "indicated" or "inferred" under U.S. Bureau of Mine definitions. Because the worth of the deposit was relatively small, McClung stated its value would not be greatly affected by differences in estimated quantities and additional exploratory work would not be warranted. McClung's values were as follows:

| Date | Estimated Reserves (Tons) | Price Per Ton | Value |
|---|---|---|---|
| May 28, 1980 | 8,400,000 (plaintiffs' estimate) | $0.015 | $126,000 |
| Aug. 26, 1980 | 1,800,000 (personal investigation) | $0.015 | $27,000 |
| Jan. 15 & 20, 1981 | 2,650,000 (Dibley & Merrill estimates) | $0.015 | $39,750 ($40,000 rounded) |
| | | $0.02 | $53,000 |

## DISPOSITION

■ Legal standards that apply to a determination of just compensation for taking the Tract 83 deposits are well established. These standards are not concerned with the commercial value of dolomite generally as a mineral; they are concerned solely with the monetary equivalent of the specific property that plaintiffs' held in Tract 83 on November 18, 1971, and that was taken on that date.

■ The fifth amendment provides that private property shall not be taken for public use without just compensation. The guiding principle is to reimburse the owner for the property that was taken, and just compensation means the full monetary equivalent of that property. The owner is to be put in the same position, from a monetary standpoint, as he would have been without the taking; he is to be made whole, but he is not entitled to more.[4] The value of the property taken is not the value to the owner for his particular purposes, and the owner does not necessarily receive compensation for all the value derived from the property. The special value of the property to the owner arising from its adaptability to a particular use is not compensated, nor is the value to the Government for some special use.[5]

■ The burden of establishing the value of the property taken rests upon the claimant.[6] As a general rule, there is no compensation for frustrated contracts or for loss of future income. The sovereign must pay only for what it takes, not for opportunities the owner loses.[7]

4. *United States v. Reynolds,* 397 U.S. 14, 15–16, 90 S.Ct. 803, 804, 25 L.Ed.2d 12 (1970); *United States v. Virginia Elec. & Power Co.,* 365 U.S. 624, 633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838 (1961); *Olsen v. United States,* 292 U.S. 246, 254–55, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934).

5. *United States v. 565.54 Acres of Land,* 441 U.S. 506, 511, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979); *United States v. Petty Motor Co.,* 327 U.S. 372, 377, 66 S.Ct. 596, 599, 90 L.Ed. 72 (1946).

6. *United States v. 145.30 Acres of Land,* 385 F.Supp. 699, 702 (W.D.La.1974), aff'd, 524 F.2d 1231 (5th Cir.1975); *United States v. Glanat Realty Corp.,* 276 F.2d 264, 266 (2d Cir.1960).

7. *United States v. General Motors Corp.,* 323 U.S. 373, 379, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945); *United States ex rel. TVA v. Powelson,* 319 U.S. 266, 281–82, 63 S.Ct. 1047, 1055–56, 87 L.Ed. 1390 (1943); *Klein v. United States,* 179 Ct.Cl. 910, 916, 375 F.2d 825, 829 (1967), cert. denied, 389 U.S. 1037, 88 S.Ct. 770, 19 L.Ed.2d 824 (1968). *See generally,* 4 Nichols, Eminent Domain § 13.33 (3d ed. 1973).

The essential question is always what has the owner lost, with the owner's indemnity measured in different ways dependent on the circumstances of the case. Just compensation invokes the equitable powers of the court and there is wide latitude of judicial discretion to include or exclude particular elements of damage.[8] Although there is wide latitude in selection of a method of valuation, the method selected cannot be so removed from economic reality that it is mere speculation or conjecture. The Supreme Court standard that requires valuation to be based on events that are reasonably probable is stated thus:[9]

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.

In most cases the question of just compensation can be answered by the ascertainment of market value—what a willing buyer would pay in cash to a willing seller. The term "fair market value" denotes what a purchaser in fair market conditions would have given, that is—"market value fairly determined."[10] Plaintiffs emphasize that a definition of "fair market value," adapted to the peculiarities of mineral properties, would provide:

> ... Fair market value is what a willing and informed buyer of mining properties, under no compulsion to buy, will pay, and what a willing and *informed mining owner,* under no compulsion to sell, will accept for the property, after fair and voluntary dealing, and taking into account all of those factors which such willing and well informed persons would consider regarding the property in light of the customs of the industry. (Emphasis added.)[11]

Fair market value is not an absolute standard, nor is it the exclusive method of valuation.[12] Where comparable sales data is lacking, resort may be had to the best available data which, even though somewhat uncertain, is sufficient to produce a value on a reasonably informed basis.[13]

The mere physical presence of a mineral on land is not enough to establish a right to just compensation; there must be a showing of a market which the mineral from that land reasonably could supply.[14] Computation of value by a process of multiplying an assumed tonnage by a unit price frequently is rejected as too speculative a procedure.[15] There generally is lacking any evidence that an informed buyer would pay such a price. In appropriate circumstances, nonetheless, this method of computation is appropriate and may be used to fix just compensation.[16]

Evidence of value is largely a matter of opinion, and some speculation is inherent in the ascertainment of value of underground resources, such as minerals, oil, or gas. Even in relatively simple cases, assessment of market value involves the use of assumptions, and it is unlikely that the

8. *A.G. Davis Ice Co. v. United States,* 362 F.2d 934 (1st Cir.1966); *United States v. Lee,* 360 F.2d 449, 452 (5th Cir.1966); *Sill Corp. v. United States,* 343 F.2d 411, 416 (10th Cir.1965).

9. *Olsen v. United States, supra* note 4, 292 U.S. at 257, 54 S.Ct. at 709.

10. *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943).

11. Campbell, Jr., "Condemnation of Mining Properties—Related Aspects of Just Compensation," 15 *Rocky Mountain Mineral Law Institute,* 305, 355 (1969).

12. *United States v. Virginia Elec. & Power Co., supra* note 4, 365 U.S. at 633, 81 S.Ct. at 790.

13. *United States v. Miller, supra* note 10, 317 U.S. at 374–75, 63 S.Ct. at 280.

14. *United States v. 1,291.83 Acres of Land,* 411 F.2d 1081, 1084–85 (6th Cir.1969); *Hembree v. United States,* 347 F.2d 109, 111 (8th Cir.1965).

15. *United States v. Sowards,* 370 F.2d 87, 90 (10th Cir.1966); *United States v. Whitehurst,* 337 F.2d 765, 771–72 (4th Cir.1964).

16. *United States v. 1,629.6 Acres of Land,* 360 F.Supp. 147 (D.Del.1973), *aff'd in part, rev'd in part,* 503 F.2d 764 (3rd Cir.1974). *United States, v. 237,500 Acres of Land,* 236 F.Supp. 44 (S.D.Cal.1964), *aff'd sub nom., United States v. American Pumice Co.,* 404 F.2d 336 (9th Cir.1968).

appraisal will measure exactly the true value.[17] The United States Court of Claims has recognized the necessity to permit speculation:[18]

> The fact, however, that a valuation reached has in it baffling elements of speculation and surmise does not mean that it should not be employed. One guess may be better than another guess, since not all guesses have in them the same element of intelligence. The realization that a considerable amount of conjecture is involved should not paralyze the function of deciding, but it should induce humility. Dogmatism is clearly out of order in a modern valuation case.

■ A number of techniques have been employed to arrive at a monetary equivalent to the theoretical fair market value. The traditional and most frequently employed technique, the "market data" or "comparable sales" approach uses sales and purchases of other properties that reasonably resemble the subject property with respect to time, place and circumstance. Other techniques include the capitalization of income approach (sometimes referred to as "discounted cash flow" or the "present worth of future income"), which relates earnings that reasonably could be expected to be derived from the property, discounted for risks and other variables, to arrive at a present value; and the cost approach, which uses depreciated replacement cost as the value of the asset.

The cost approach was not used by either party in this case. Defendant used both the comparable sales approach and modifications of the capitalization of income approach in appraisals by its experts. Plaintiffs found no sales of quarry properties which were adequate to use in comparisons for valuation purposes with the Tract 83 properties; plaintiffs accordingly submitted no fair market value as determined by what a willing buyer would pay in cash to a willing seller in a comparable sale. Plaintiffs' valuations are based upon variations of the capitalization of income approach.

Plaintiffs emphasize that the comparable sales approach has limitations that render it unsatisfactory for appraisal of mining properties. The most important limitation is the requirement that the properties in fact must be comparable for the technique to be reliable. Comparability of real estate sales involves such factors as time of transaction, location of the property, quantity and quality of the property sold, nature of the sale, the primary interests of the parties, as well as other factors peculiar to a particular transaction. There are few sales of mining properties, comparative data is limited, and since each mining property is unique as to quality, size, location, accessibility, ability to be mined, and access to available market, it is exceedingly difficult to isolate sales that accurately reflect a substitute for the property being appraised. On the basis of such differences, plaintiffs point to infirmities in the sales identified by defendant's experts that render the sales subject to valid criticism as lacking the traditional indicia of comparability.

Defendant's appraisal expert Chapman utilized sales of four actual or potential quarry sites for comparative purposes, one of which was the May 2, 1972, sale of the entire mineral interest in the 876.26 acres on Tract 83 to plaintiffs for $5,000. Selling prices in the other comparisons were: Sale No. 1—$22,500 for 36.15 acres, sold on April 25, 1975; Sale No. 2—$29,000 for 200 acres sold December 20, 1973; and Sale No. 3—$25,000 for 119 acres sold on March 2, 1973.[19]

Plaintiffs contend Chapman's sales are not comparable: because the transactions did not involve purchases of land for quarry

---

**17.** *United States v. Miller, supra* note 10, 317 U.S. at 374, 63 S.Ct. at 280; *United States v. Silver Queen Mining Co.,* 285 F.2d 506, 510 (10th Cir.1960).

**18.** *Cities Service Gas Co. v. United States,* 217 Ct.Cl. 590, 597, 580 F.2d 433, 438 (1978).

**19.** Defendant's geology expert Bowen testified on real estate sales which he considered to be comparable. Plaintiffs established that these sales lacked comparability because of remoteness in time, from 17 to 27 years, distances, or because the mineral deposits were not identified as elements in the transaction.

purposes; because parts of the mineral reservations had been retained by prior granters; because the acreages specified by Chapman were inaccurate in that the sale was evaluated on the basis of extracting a portion of the land sold and applying a factor to that portion; or because it was unlikely that a conditional use permit could be obtained. Plaintiffs' contentions have merit; Chapman's Sales Nos. 1–3 are of questionable comparability.

■■■■■ Defendant acknowledges the difficulties involved in defining a market for mineral properties and the effects of a paucity of sales for appraisal purposes. Defendant, however, asserts the comparative sales data available in the record provides information that reasonably may be recognized and used as a basis for expert opinion. Elements of sales of quite distant properties, even those with different mineral content, may be comparable in an economic or market sense when due allowance is made for variables.[20] The requirement to show similarity is not as rigorous when the sales data becomes part of the foundation for testimony of an expert subject to cross examination as it is when the sales of other property are offered as substantive proof of value.[21] Comparative sales data used by defendant's expert witnesses, Bowen, Chapman, and McClung, although deficient in some particulars, does not warrant rejection of their opinions, as plaintiffs contend.

■■■■■ Plaintiffs contend the appraisal profession prefers the capitalization of income approach for valuation of mineral properties and that method is the primary means employed in the mining industry itself. Historically, the capitalization of income approach to value has been suspect, primarily because "just compensation" for property taken by the Government does not include compensation for the loss of pro-

spective or anticipated business opportunities. Direct capitalization of net income is an appropriate method only when actual income from the property can be established in a continuing on-going business. It is of little value where the realization of an opportunity for income was not even begun as of the date of taking.[22]

The capitalization of income approach has become acceptable in recognition of situations where income producing potential is a key element for both buyer and seller in many negotiations in arriving at a fair price. As to mining properties, plaintiffs contend that the calculation of future income from the extraction of the mineral provides a more accurate measure of value than so-called comparable sales data because mineral deposits inherently must be quite dissimilar.

■■■■■ Plaintiffs emphasize the capitalization of income approach to compute value of a mineral property does not compensate a property owner for lost business profits— it is said to measure the compensation for recognized interests in real property—the royalty interest or the operator's interest. A royalty interest is an interest of a passive land owner-lessor or of an inactive lessee; an operator's interest is the interest of a person with the right, the capital, and the ability to develop, produce and sell the mineral. These interests are property rights that can be bought and sold. Both Federal and state courts recognize the royalty interest and the operator's interest as component parts of the whole mineral estate.[23]

■■■■■ Although a computation by the capitalization of income approach involves multiplication of tonnage volumes by net income per ton, the operator's interest in a mineral estate has a different function than as a measure of an operator's profit. The

**20.** *United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949); *United States v. American Pumice Co.,* supra note 16, 404 F.2d at 337.

**21.** *United States v. 429.59 Acres of Land,* 612 F.2d 459, 462 (9th Cir.1980).

**22.** *United States v. 15.00 Acres of Land,* 468 F.Supp. 310, 314 (E.D.Ark.1979).

**23.** *United States v. 237,500 Acres of Land,* supra note 16, 236 F.Supp. at 50; *United States v. 180.37 Acres of Land,* 254 F.Supp. 678 (W.D. Va.1966).

operator's interest is a separate right to produce and sell the mineral. When bought and sold on the open market, it commands a price that represents a present value, measured by an estimate of what can be earned by exercise of the right. The value placed on an operator's interest is not compensation for the consequential damages of lost future business profits; it is compensation for the taking of an interest in real property.

In a particular case, each approach to valuation appropriately can be useful as a tool to arrive at an amount equivalent to the hypothetical fair market value, when the buyer and seller each is fully informed and acts in the absence of constraints. In this case, the facts that delineate exactly the property interest plaintiffs had on November 18, 1971, and the information available in the record on the facts that define the quality and quantity of the mineral taken, establish the approach to valuation that should be used.

When plaintiffs' property was taken on November 18, 1971, plaintiffs were lessees with an operator's interest in the "right to extract and remove and take from the premises all riprap rock." The lease, for a term of 5 years ending May 1, 1976, had an option to renew for an additional 5-year period, through May 31, 1981. On November 18, 1971, defendant took plaintiffs' operating interest in the leasehold. On that date, plaintiffs' predecessors-in-interest had the royalty interest in the lease during its term and the reversion at its expiration. Plaintiffs' predecessors-in-interest also owned the reserved interest in all other minerals in Tract 83. Plaintiffs' May 1972 purchase acquired the balance of the reserved mineral fee and the reversion of the lease after 10 years and merged the operating interest with the royalty interest in the right to extract and remove riprap. What is to be valued, therefore, is the amount plaintiffs are entitled to receive as just compensation for the operator's interest in

a 10-year lease with the right to extract dolomite for use as riprap from the Tract 83 deposits.

The principal elements that determine the value of plaintiffs' operator's interest in the leasehold—the quantity of dolomite and its quality as related to use—are uncertain. Plaintiffs' experts estimate that the Tract 83 deposits would contain 3,637,000 cubic yards (8,365,100 tons) of dolomite if mined to a 100′ depth, and 5,456,000 cubic yards (12,548,800 tons) of dolomite when mined to the 150′ depth.[24] Plaintiffs' final expert (Paschall) estimated that the total production from the Tract 83 deposits that could be sold during the 25-year period from 1972–96 would amount to 4,237,884 tons, of which 1,162,871 tons would be aggregate and 3,075,013 tons would be riprap. Defendant's experts variously estimated that the Tract 83 deposits contained no more than 2 million tons of limestone or dolomite (Bowen); or that the deposits contained approximately 1,659,230 tons of dolomite suitable for production of medium-size riprap (Merrill); or that the deposits could contain from 1,800,000 to 2,650,000 tons of mixed rock suitable for use as common variety stone (McClung).

On the basis of these estimates, it is concluded that it is probable that at least 1.5 to 2 million tons of dolomite suitable for riprap purposes would be able to be recovered from the Tract 83 deposits. This conclusion, however, must be tempered by recognition that the misfortune experienced by the Missile City quarry could occur at Tract 83.

The Missile City Corporation was formed about 1959 to extract dolomite from a deposit near Lompoc, California. Geology experts for Missle City were of the opinion there was a "mountain" of dolomite with reserves that approximated 600,000,000 tons that assured a virtually inexhaustible supply. The Corporation obtained a 50-year

---

**24.** One of plaintiffs' appraisal experts (McVay) estimated there would be 13,094,000 tons recovered from the 3,637,000 cubic yards when the deposits were mined to a depth of 100′; he

used a factor of 3.6 for tons of dolomite per cubic yard. Plaintiffs' appraisal expert at the second trial (Paschall) used a factor of 2.3.

lease, constructed a one million dollar processing plant, and began production in 1960. After 3 years, and production of 1,500,000 tons of dolomite, the deposit was exhausted. The Missile City quarry terminated operations with losses of about $3 million.

The Missile City experience hovers as a specter over projected Tract 83 operations. Expert opinion by respectable geologists about the reserves was shown to be invalid. The dolomite deposit that looked exceptionally promising was a deposit of limited volume. Missile City quarry's location, close to the Tract 83 deposits, and involving similar formations, increases the possibility that the Tract 83 deposits also could experience similar early exhaustion.

The quality of the Tract 83 deposits for commercial exploitation also is subject to wide divergence in the experts' opinions, with resultant uncertainty in the record. The Tract 83 deposits, from the standpoint of their chemical composition, contain rock dolomite that is suitable for production of riprap and armor stone, and for other uses in the construction industry. The deposits also contain mineral dolomite of sufficient purity for pharmaceutical, agricultural, and other specialized secondary uses. These chemical qualities were the basis for the conclusion that the dolomite was a reserved mineral.

The value of the deposits, however, is dependent upon many factors in addition to their chemical composition. Availability of markets for dolomite from Tract 83, in large measure, is dependent on transportation costs. Other factors that affect commercial exploitation include the technical ability to extract the material in the sizes and volumes required for various specific uses, and the extent to which the expense of selective extraction techniques would be required, and could be justified, in order to obtain a given volume with a high degree of purity.

The parties agree that the Tract 83 deposits would be suitable for use as riprap, and other construction uses, and that some armor or derrick stone probably could be produced. The parties differ on the ability of the Tract 83 deposits to satisfy market demands for any such uses.

Plaintiffs' quarry expert (Schmidt) estimated that the Tract 83 dolomite deposits could be quarried to yield about 40 percent derrick stone and 60 percent stone of riprap size. Plaintiffs' appraisal expert (Paschall) considered the Tract 83 deposits to be able to produce 70 percent riprap, and 30 percent concrete grade aggregate. He also found that the Tract 83 deposits over a 25-year period could supply 205,921 tons of dolomite for agricultural use.

Defendant's expert (Bowen), on the other hand, estimated that the Tract 83 deposits would yield 40–50 percent riprap of all sizes but under 5 percent of 10–20 ton derrick stone. The geologist for the Los Angeles District, Corps of Engineers, questioned whether the deposit could produce substantial quantities of large size derrick stones because of close spaced joints caused by movement along the nearby Hondo Fault. He considered the deposits suitable for production of riprap in the 4″ to 12″ size. Defendant's expert (Merrill) testified that the faulting and fracturing in the deposits made him doubt that any large size derrick stone could be produced, but that the deposits could be suitable for the production of medium size riprap.

Defendant's expert (Bowen) believed that the presence of Monterey shale made rock from Tract 83 unsuitable for concrete, and that a mixture of Monterey shale with Tract 83 dolomite rock was unavoidable. Defendant's expert (McClung), however, assumed that Tract 83 would be suitable for use in concrete aggregate, but considered the Tract 83 deposits to be such a mixture of dolomite and other rock that it could be suitable only for use as common variety construction stone.

The record in this case justifies the conclusion that the value of the Tract 83 deposits primarily is for production of riprap, including derrick stone, and stone for various construction purposes, including use as aggregate in concrete. The record, however, does not support a conclusion that the Tract 83 deposits have any value for pro-

duction of dolomite commercially for agricultural or pharmaceutical purposes, or for any of dolomite's secondary usages.

Uncertainties in the record as to the quantity and quality of dolomite available for use as riprap were compounded by the experts' differing appraisal techniques. This resulted in extreme differences among the experts in the monetary value of the property taken. Plaintiffs' experts, in their application of the capitalization of income approach, produced calculations where final values differed substantially because of variables in the factors used. The elements of a calculation of projected future income can involve speculation, optimistic assumptions and uncontrollable variables. Although the calculation may be internally consistent, the capitalization of income approach frequently does not produce reasonably persuasive evidence of value.

In the first trial, plaintiffs' expert McVay by the capitalization of projected royalty income, valued the royalty interest in plaintiffs' lease as of November 18, 1971, at $195,000. McVay computed a value of the operator's interest at $106,000, on the basis of an estimate of sales that could have been made on the Rincon project, and, on the basis of estimated sales for the Port San Luis project, at $1,812,000. Plaintiffs' hard rock quarry operator (Schmidt) computed a value of the operator's interest as of the date of trial (1977) by a calculation of estimated income from a bid for the Port San Luis project. This calculation produced a total operator's interest of $3,332,500, and when $215,000 was added for the royalty interest, resulted in a total profit of $3,547,500 on 215,000 tons of armor stone. Schmidt also projected as a by-product of the armor stone. This calculation increased the value of the operator's interest by $640,000, and a total value for the operator's interest of $4,187,500. Schmidt did not apply a discount factor to compute the present value of the operator's interest.

The deficiencies in Schmidt's and McVay's income capitalization computations were reviewed in detail in the October 18, 1978, opinion, and their values were reject-

ed as "blue sky speculation." The opinion concluded:

There are serious defects in plaintiffs' computations of the royalty interest and the operator's interest. Factors utilized by McVay and Schmidt in their computations rest upon speculative assumptions, and as a result, their computations, although internally consistent, produce results which could not reasonably be expected in the factual context that apply to quarry operations for the production of riprap in southern California. This failure to anchor assumptions to information corroborated by demonstrable facts renders the computations mathematical exercises unrelated to reality.

Deficiencies in the experts' calculations included: failure to make allowance for production from competitive quarries; an assumption that plaintiffs could successfully conduct quarry operations on a scale to capture profitably 60,000 tons of the projected annual demand for riprap; failure to include in the calculations an analysis of start-up costs, including capital investment in machinery and transportation equipment, and assembly of qualified personnel; failure to include costs to improve the LaSalle Canyon Road for use by heavy truck traffic; failure to consider costs required by the necessity to coordinate the quarry operations with operations at Vandenberg Air Force Base; and a lack of justification for transportation costs utilized in the calculations.

The October 18, 1978, opinion, in a comparison of the qualifications of the experts called by the parties, noted that plaintiffs' geologists primarily were academically oriented scientists and that defendant's geologists, in contrast, primarily were business oriented with more extensive operational experience. Plaintiffs' real estate appraisal expert (McVay) was found not to be as experienced as defendant's (Chapman). The opinion concluded that the methodology employed by Chapman was sound, and that defendant's valuation of projected income flow more nearly accorded with accepted valuation standards. The opinion

accorded substantially greater weight to Chapman's opinion as to the value of the right to extract dolomite at the Tract 83 deposits.

Chapman prepared estimates of just compensation based on the present value of future income anticipated to be derived from operation of a quarry on the Tract 83 deposits. The Tract 83 deposits were considered available only for production of riprap and aggregate. The analysis of the potential demand for stone produced at the Tract 83 deposits postulated an intermittent demand for riprap of 25,000 tons at 5-year intervals, and a demand for aggregate at 13,500 tons annually. Chapman's income approach valuations took into consideration supplies available in competition to the Tract 83 deposits, and included a transportation feasibility study that compared transportation costs from the Tract 83 deposit sites with the transportation costs from competitive rock sources.

In his computation of valuations on an income approach, Chapman constructed three cash flow models. The original appraisal model projected a 25-year lease which paid the lessor a minimum base royalty of $4,500 per year. The annual income, $4,500 discounted at 15 percent over the term of the lease, resulted in a value of $29,088.

Chapman's Model No. 2 projected an average annual demand for all rock at 10,346 tons per year, a sporadic demand for riprap at 5-year intervals, and a 25-year lease. Discounted at 15 percent, the cash flow in this model produced a valuation of $32,945, which rounded to $33,000.

In Model No. 3, although the quarry remained open, it was inactive between short-term lease contracts that were negotiated separately during the 25-year period. Demand was projected at an annual average of 10,346 tons for all rock with a sporadic demand for riprap at 5-year intervals. This model produced a valuation of $23,971, which rounded to $24,000.

Chapman's valuation on the basis of comparable sales of the mineral rights reserved on Tract 83 ranged from $5,000 to $29,000. His final opinion of value as of November 18, 1971, allocated $23,250 to the right to extract dolomite.

The October 18, 1978, opinion also found deficiencies in the analyses of defendant's expert. Chapman postulated that inactive quarries would reopen and be a competitive supply for riprap to a greater degree than probably would be able to be realized. There was a failure to consider that environmental constraints on quarry operations would impede or prevent some reopenings. Another deficiency was Chapman's analysis of the market area in which the Tract 83 stone could be competitive. It was too restricted, particularly with respect to the market for armor stone.

At the second trial, plaintiffs through testimony and documentary evidence sought to correct deficiencies in the valuations of its experts which had been noted in the October 18, 1978, opinion. Plaintiffs presented the report and testimony of Robert H. Paschall, an expert witness with superior qualifications.[25] His report and testimony is the foundation for plaintiffs' final valuation of $5,029,532. Plaintiffs' other witnesses provided specific facts which Paschall utilized.

Paschall's appraisal method involved the projection of the level of future demand for concrete-type aggregate and stone for the years 1972–96 in the Lompoc Valley and North County areas, and an estimate of the amount of this demand that could be cap-

25. Robert H. Paschall, a professional geologist as well as a professional appraiser, was the most senior evaluation geologist to testify. His professional qualifications include: Senior Member (Natural Resources), American Society of Appraisers; Charter Member, American Institute of Professional Geologists; Member, Society of Mining Engineers of AIME; Registered Geologist, State of California (Cert. No. 8); and Registered Professional Engineer, State of California (Cert. No. 537). He was also the editor and principal author of "Assessor's Handbook 560", "Valuation of Mines and Quarries," published by the California State Board of Equalization, 1973, which is the official guide in California for the market-value appraisal of mining properties for property tax purposes.

tured by Tract 83 production. These production volumes were applied to net operating profits per ton to derive the total net operating income (NOI) for each year of the 25-year period. The total NOI per year then was multiplied by the relevant present worth factor for a 10.5 percent rate of return; this gave the present worth of NOI for each year. The discounted NOI total for all years produced a total property value, from which Paschall deducted the value of investments in associated plant and equipment, to obtain the residual mineral right value as of the taking date.[26]

Paschall abandoned demand estimates that were based on particular projects (Port San Luis and Rincon), as used by McVay and Schmidt. His demand analysis began with statewide demographic data on rock and aggregate production figures during the 5-year period 1967–71. Those figures were projected for 25 years in the market area, using the exponential rate of change that was derived from the 5-year period. By this procedure, Paschall claimed his estimates of total 1972–96 needs of concrete-type aggregate and stone in the Lompoc Valley and North County areas took the question of total future demand out of the field of guess work, and avoided the "fruitless arguments over the possible contribution of this project and that project to the viability of a given rock and aggregate operation."

Paschall also included an allowance for the cost of improving the LaSalle Canyon Road, and provided for start-up costs, including investment capital for machinery and transportation equipment. His analysis of Tract 83's transportation advantage due to its location included an examination of the locations of quarries potentially available to supply 16 projects that had been under consideration over a 15-year period. His reports and testimony included a discussion about the ability of plaintiffs to undertake a quarry operation of the magnitude projected. This was supplemented by testimony from Jack S. Foster and James H. Mosby, which established that financial support would be available to launch a Tract 83 quarry, and that plaintiffs could provide the experience required for its operations.[27]

Paschall's calculation of a $4,221,000 value for the Tract 83 dolomite rights includes elements that are variable through the operation of a variety of causes. Even small variations in some of these elements can result in substantial differences in the final value. Uncertainty concerning the validity of Paschall's assumptions, and the lack of objective standards to control the variable elements, notwithstanding the fact that his appraisal calculations have a logical consistency, render his final value determination unrealistic and unpersuasive.

Basic to Paschall's calculations is the assumption that the per capita usage of stone and concrete grade aggregate in the entire State of California during the 5-year period 1967–71 would be a measure of the per capita usage in Tract 83's markets in Santa Barbara county during a 25-year period from 1972–96. That the per capita use of stone and aggregate in Santa Barbara county would be equivalent to such use statewide is not self-evident. Further, Paschall did not show and compare actual

26. Paschall's computation of NOI per ton treated royalty to the lessor as an expense. His calculation of the value of the operator's interest in the leasehold, accordingly, correctly includes the amount that represents value of the lessors' interest.

27. James H. Mosby has been a practicing dentist since 1958 and has lived in the vicinity of Lompoc, California, since December 1959. He has had extensive and profitable experience as a land developer. In June 1968, James H. Mosby acquired the lease to a rock quarry located about 10 miles from the Vandenberg Air Force Base Tract 83, and he operated that quarry (Missile City) for approximately 3 years. Jack S. Foster is a general engineering contractor who has had extensive experience in rock quarry operations. His background includes quarrying operations in the Philippine Islands, in Alaska, and in most of the quarries in the central coast area of California. Since 1958, his contracting activities have involved building roads, reservoirs, quarry work, building sites, and subdivisions. Foster and Mosby first met in 1969, at which time Foster's activities involved operations in the See Canyon, Missile City, Morrow Rock, and Cambria Pines quarries.

Santa Barbara county uses during the period 1967–71. Paschall's per capita use of aggregate is based on the quantity of cement produced in California, multiplied by 6. No adjustment was made for cement produced in California but exported and not used in California, nor was adjustment made for that portion of aggregate needs in the 1967–71 period that was satisfied by suppliers of natural gravel rather than by suppliers of crushed stone. Slight variations in Paschall's per capita usage figures would have greatly magnified effects in the sequence of subsequent calculations.

Paschall assumed that the 2.42 percent rate of growth of the California State population from 1960 to 1970 would be the same as the rate of population increase in the Lompoc Valley market and in the North County market annually from 1972 through 1996. Paschall constructed a January 1972 population number for Lompoc Valley from 1979 data, and a number for total North County from 1970 data. Paschall made no showing of Lompoc Valley population or total North County population for the 1960–70 period. The rate of growth in the populations of these two market areas may or may not coincide with the statewide population rate.

Population numbers, however, are central to Paschall's computation of demand for stone and aggregate in Tract 83's markets, as well as for Tract 83's annual production. The rate of population growth used by Paschall has the effect in subsequent calculations of increasing Tract 83 stone production for Lompoc Valley from 42,805 tons in 1972 to 75,995 tons in 1996, and for Other North County from 32,138 tons in 1972 to 56,982 tons in 1996. Net operating income from Lompoc Valley sales of stone was computed at $218,304 in 1972 and grew to $387,574 in 1996; Other North County NOI similarly grew from $147,835 in 1972 to $262,117 in 1996. Paschall's use of the population rate of growth factors had the effect of assuring a constant increase in NOI for 25 years. Again, even slight variations in the factor used by Paschall would have magnified effects on the total residual value obtained.

Paschall allocated to Tract 83 production a capture of 50 percent of the Lompoc Valley demand for stone, 20 percent of Other North County demand for stone, and 30 percent of Lompoc Valley's demand for concrete aggregate during each year of the 25-year production period. This allocation was based on a personal assessment of the ability of other quarries to compete, and was confined to considerations related to capacity and location. Other percentages could just as reasonably have been selected, with entirely different effects on the result.

The record supports the conclusion that, for other items, values could have been used that were different than those used by Paschall in his computations. Paschall estimated that Tract 83 over 25 years would produce 1,162,871 tons of aggregate and 3,075,013 tons of stone. Wholly apart from the Missile City experience, respectable opinion in the record, as discussed above, supports the conclusion that Paschall's estimate of quantity may be excessive. The same conclusion is applicable to his estimate of quality, i.e., that Tract 83 could produce 70 percent riprap and 30 percent concrete aggregate.

To compute Tract 83's net operating income per ton Paschall estimated a production cost of $0.90 per ton. Plaintiffs' expert (McVay), on the other hand, used a production cost per ton of $2.50 in his computation of the operator's interest based on the Port San Luis project, and a production cost of $1.50 for his computation based on the Rincon project. Plaintiffs' quarry expert (Schmidt) estimated production costs for blasting, sorting and loading at $1.50 per ton. Defendant's expert (Chapman) used an average production cost for all rock produced in the quarry over the 25-year period; this figure was $0.3125 per ton. Paschall's estimate of $0.90 cost per ton was based on a comparison of production costs of four California quarry operations that ranged from $0.65 to $1.14 per ton and was referenced to a proposed output of 220,000 tons per year. Tract 83's production was estimated to range from 125,424 tons in 1972 to

222,557 tons in 1996. It is obvious that the amount for production costs in Tract 83's projected operations is a variable that reasonably could have been different from the amount used by Paschall. Any different amount would have produced a value other than Paschall's recommended value.

Paschall's estimate for improving the La-Salle Canyon Road for use by heavy truck traffic was based on conversations with plaintiffs' quarry operator (Sanchez). These estimates, as of November 1971, were $6,264 for basic grading and widening, and $16,704 for an all weather surface, a total of $22,968. Defendant's estimate of the cost to rebuild the LaSalle Canyon Road was $300,000 per mile, a total of $750,000. The cost to build a road capable of heavy truck use over a 25-year period probably would exceed plaintiffs' estimate substantially, and may even exceed defendant's.

■ The capitalization of income approach requires the future income stream to be discounted in order to obtain a "present value" as of the date of taking. Paschall multiplied the total NOI per year by a present worth factor for a 10.5 percent rate of return.[28] Different discount rates were used by other experts in their capitalization of income calculations: McVay used 17 percent, Schmidt did not apply a discount factor, and Chapman used discount factors of 15 and 18 percent.

Paschall's use of a discount factor based upon a 10.5 percent return on invested capital does not adequately reflect the risks involved in the operations of a quarry on Tract 83 over a 25-year period. The discount factor Paschall used accounts only for the value of the deferral of income over time; it measures compensation for a lost rate of return on a capital sum invested in 1971. Paschall's discount factor does not account for the risks involved in a business to start on raw, unproven land, with no history of income producing operations. Nor does it account for the risk that in any particular year the quarry could operate at a loss and have a negative NOI, or that the NOI over time could change due to the quantity or quality of the deposits, or because sales were lost to competitors. Such risks, moreover, were not accounted for in the other elements of Paschall's calculations.

In sum, Paschall's appraisal computations produced an interesting mathematical exercise. They are defective, however, and do not produce an acceptable measure of the value on November 18, 1971, of the operator's interest in the right to extract dolomite from Tract 83.

## CONCLUSION

■ On the basis of the entire record compiled in both trial sessions, it is concluded that the value of plaintiffs' leasehold interest taken on November 18, 1971, was $28,000, and plaintiffs are entitled to that amount. Deficiencies in plaintiffs' calculations that employed the capitalization of income approach are apparent on the record, and plaintiffs have not shown that any knowledgeable purchaser would have been willing to pay an amount even approximating the valuation they seek, or, indeed, any amount more than $28,000. It is concluded that the testimony and evidence on value by Robert L. Chapman, Oliver W. Bowen, William R. Merrill and C. William McClung, are more persuasive and are entitled to greater weight than the final estimates of plaintiffs' experts. The amount allowed gives effect to the contention of C. William McClung that dolomite would have a value of from $0.015 to $0.02 cents per ton in place, and to the estimate of Robert H. Paschall that Tract 83 over the 10-year period of plaintiffs' lease could produce a

28. Paschall's total enterprise rate of return was obtained in a calculation where net operating income (before depletion and depreciation, amortization, interest and income taxes) was divided by enterprise value (common stock, preferred stock, current liabilities and long term debt). The 10.5 percent rate used in his appraisal was obtained from the average of the rates of return on invested capital of four operating cement companies: California Portland (10.9%), General Portland (10.8%), Kaiser Cement and Gypsum (11.0%), and Lone Star Industries (10.1%).

total of approximately 1,400,000 tons of dolomite, and it takes into account the fact that plaintiffs were able to purchase in 1972 for $5,000 the royalty interest in the leasehold, as well as the balance of the reserved mineral fee.

 In order to produce the full equivalent of the property taken, just compensation includes interest on the market value of the mineral rights taken, computed at simple interest rates from the time of taking to the time of payment.[29] The proper rate of interest to be applied in this case is 7.5 percent during the 1971–74 period, and 8.5 percent during the 1976–79 period.[30] Interest at 12 percent per annum for 1980 has been held in this court to be reasonable.[31] The average yield on Aaa bonds in Moody's Composite Index on Corporate Bonds for 1981 was 15.06 percent; for the 6 month period January-June 1982, it was 15.71 percent. It is concluded that for the year 1981, and until the date of payment, interest at the rate of 15.5 percent would be reasonable.

The Uniform Relocation Assistance and Real Property Acquisition Policies Act authorizes payment of litigation expenses, including reimbursement for reasonable attorney, appraisal and engineering fees, in a taking case when compensation is awarded.[32] Plaintiffs may file an application for litigation expenses, with supporting itemized accounts, within 30 days after the date of this opinion. Defendant may file a response 28 days after plaintiffs' application is filed, to which plaintiffs may reply in 14 days. Defendant's response shall include a statement of the man-hours utilized by the United States on this case, and the amounts defendant paid to consultants and experts.

---

**29.** *Albrecht v. United States*, 329 U.S. 599, 67 S.Ct. 606, 91 L.Ed. 532 (1947); *Miller v. United States*, 223 Ct.Cl. 352, 620 F.2d 812 (1980).

**30.** *Miller v. United States, supra* note 29, 223 Ct.Cl. at 404–05, 620 F.2d at 840.

**31.** *Berenholz v. United States*, 1 Cl.Ct. 620, at 633 (1982) (Colaianni, Judge).

